## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES BORAVIAN, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>           v.<br><br>STAR SCIENTIFIC, INC., and JONNIE R. WILLIAMS,<br><br>     Defendants. | **CASE No.:**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Charles Boravian, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than defendants, who purchased the common stock of Star Scientific, Inc. ("Star Scientific," "STSI," or the "Company,"), between May 14, 2012 and January 23, 2013, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

6.      Plaintiff Charles Boravian purchased STSI common stock during the Class Period as set forth in his certification, filed herewith, and has suffered damages as a result.

7.      Defendant Star Scientific, Inc. is a Delaware corporation with its principal executive offices in Glen Allen, VA.  It acquired its current form on February 16, 1999, through a reverse merger, in which a private company sold substantially all of its assets to a public shell, in exchange for substantially all of the public company's shares. Star Scientific trades on the NASDAQ Exchange under the ticker STSI.

8.      Star Scientific's original business was selling low tobacco-specific-nitrosamine products. But year after year, its sales steadily diminished, and as a result, in 2007, Star Scientific determined to transition to a different business.  It then formed a subsidiary named Rock Creek Pharmaceuticals ("Rock Creek").  Since then Star Scientific has focused on using tobacco-based products to treat neurological conditions, which are researched and manufactured at its Rock Creek facility.  The products include Anatabloc, a nutraceutical dietary supplement

providing anti-inflammatory support, and CigRx, a product used in quitting smoking. Rock Creek maintains its offices in Gloucester, Massachusetts.

9.     Defendant Jonnie R. Williams has been Star Scientific's CEO since November 1999, and one of its directors since October 1998.

10.    Williams:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

    (d) was involved in drafting, producing, reviewing and disseminating the false and misleading statements and information alleged herein;

    (e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

    (f) approved or ratified these statements in violation of the federal securities laws.

11.    As an officer, director, and controlling person of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, Williams had a duty to disseminate accurate and truthful information promptly with respect to the Company's business and financial condition and to correct any previously-issued statements that had become materially misleading or untrue, in order to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

12. The Company is liable for the acts of Williams and its other employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

13. Williams's scienter is similarly imputed to Star Scientific, under *respondeat superior* and agency principles.

## DEFENDANTS' MISCONDUCT

14. Anatabloc is the trade name for a product that was developed in August 2011 by Rock Creek Pharmaceuticals in Massachusetts. Anatabloc's primary active ingredient is anatabine, an alkaloid found in tobacco.

15. Rock Creek sells Anatabloc as a dietary supplement to provide anti-inflammatory support, and since September 2012 as a facial cream to improve the appearance of the skin.

16. According to Star Scientific's 2012 Form 10-K, "virtually all" of its revenues were derived from sales of Anatabloc. Those revenues were, for 2012, approximately $6,188,000. These revenues are not sufficient to sustain Star Scientific. It *lost* $24,613,000 from its operations in 2012. It also lost $35,671,000 in 2011, and in 2011 its cost of goods sold exceeded the revenue it earned from selling the goods it manufactured.

17. On June 27, 2012, Star Scientific issued a materially false press release concerning the involvement of Johns Hopkins in a purported clinical trial of Anatabloc. As is well known, Johns Hopkins University is highly ranked nationally. Johns Hopkins Hospital is widely regarded as one of the world's greatest hospital. Johns Hopkins Hospital is the teaching arm and biomedical research facility of Johns Hopkins School of Medicine, one of the leading medical schools in the United States.

18. The June 27, 2012 press release states in relevant part:

**Star Scientific Announces Noteworthy Anatabloc® Scientific Presentation at ENDO 2012**

GLEN ALLEN, Va., June 27, 2012 /PRNewswire/ -- Star Scientific, Inc. (NASDAQ: CIGX) announced today that the results of a successful animal study supporting the potential thyroid benefit of nutritional supplementation with Rock Creek Pharmaceuticals' anatabine supplement, Anatabloc®, were presented on Tuesday, June 26, in Houston, Texas, at ENDO 2012, the annual international meeting of the Endocrine Society.

* * * *

**The independently funded research team at Johns Hopkins conducted and completed a study of anatabine nutritional supplementation** in a mouse model of autoimmune thyroiditis, entitled "Anatabine, a Tobacco Alkaloid, Reduces Disease Incidence and Severity in a Mouse Model of Autoimmune Thyroiditis."

Studies performed in the immunopathology laboratory of Dr. Patrizio Caturegli utilized female mice, placing half of them on dietary supplementation (drinking water) with anatabine, and the other half on plain water. All mice were injected with mouse thyroglobulin in Freund's adjuvant, a procedure that reliably induces autoimmune thyroiditis with histopathological features and thyroid gland dysfunction similar to Hashimoto's thyroiditis in humans.

Anatabine dietary supplementation significantly reduced the incidence and severity of experimental autoimmune thyroiditis. Thirty-one of thirty-two control mice developed thyroiditis (97%), as compared with twenty-one of twenty-nine (72%) anatabine treated mice (P<0.007). More importantly, the anatabine treated mice that did develop thyroiditis had lower histopathological severity of inflammation, lower anti-thyroid antibody levels early in their disease, and lesser declines in serum thyroxine.

**The results of the full study, which was preliminarily reported in a poster presentation last fall at the Annual Meeting of the American Thyroid Association, led Dr. Paul W. Ladenson, Director of Endocrinology and Metabolism at Johns Hopkins,** to comment, "Our finding that anatabine reduces the incidence and severity of autoimmune thyroiditis in this mouse model justifies human studies of whether this nutritional supplement may be effective in preserving thyroid health in people with Hashimoto's thyroiditis. Consequently, a human trial to test this hypothesis (the ASAP Thyroid Study) was designed and is now being carried out."

Dr. Curtis Wright, Senior Vice President and Medical/Clinical Director of Star Scientific's wholly owned subsidiary Rock Creek Pharmaceuticals Inc., stated, "We started our research with the simple goal of developing a useful nutritional supplement. The possibility, now supported by external research findings that one of our products could help maintain thyroid health, is very exciting to us, and is ample reward for the efforts of Rock Creek's research team in designing and conducting the ASAP Thyroid Study with the oversight assistance of an independent scientific committee. **The current impressive results achieved by the Johns Hopkins team strongly support the first look at the thyroid data in man, which we anticipate will be available in the third quarter."**

(Emphasis added).

19.     Meanwhile, relying on Star Scientific's representations, third parties touted Star Scientific's purported relationship with Johns Hopkins.  For example, in a report published on the internet on May 14, 2012, Dr. John Faessel reported on a meeting held by Star Scientific at the Harvard Club in New York City for Star Scientific investors.   Dr. Faessel reported that Defendant Williams told investors that "Johns Hopkins Medicine" was engaged in nine studies testing Anatabloc.[1]  Nor was this a slip of the tongue; Dr. Faessel also reported that multiple questioners inquired about Star Scientific's "multiple" studies with Johns Hopkins.

20.     Based on the representations made by Star Scientific and Defendant Williams, Dr. Faessel touted Johns Hopkins' involvement with Anatabloc in an online posting on October 9, 2012.

> Very soon, IMHO, the Star Scientific landscape will change dramatically as ***Johns Hopkins*** is about to release their nine city study on the effects of Anatabine/Anatabloc on thyroid disease.  Un-blinding, compilation and analysis of their study results are likely near or already finished by their contract research organization [CRO] prior to ***Johns Hopkins*** receiving and publishing the results. There is much riding on these scientific findings as naysayers (shorts) and the true believers (that would include me) are so dramatically on the different sides of the 'story' that's tied to the beneficial effects of Anatabine/Anatabloc.   The naysayers/shorts have continually increased their mega million $ bet saying the compound doesn't work - or it's a scam - or the inventory levels are increasing or the company needs more money or the CEO wears a black hat and rides a black horse or whatever.  Interestingly, they never question the results of the ***Johns Hopkins*** or Roskamp science but they are all-over the balance sheet and peripheral issues.

\* \* \* \*

---

[1]  Available  at  <http://seekingalpha.com/instablog/576542-dr-john-faessel/618891-report-from-the-harvard-club-meeting-re-cigx-snowballing-progress>.

Notable is that Institutional Ownership is at record highs of 28,869,979 shares held by 155 holders plus the Institutional ownership of 'over' 10% holders - Tradewinds Master Fund, holds another 16,606,520 shares.

For those of us on the long side, we give heed to the stunning and growing array of prestigious institutional and scientific names that hover around and about the Anatabine/Anatabloc science.   And mind you, these names have told of/ published their research findings in professional venues of the highest order in prime time keynote lectures to assembled scientists and physicians. Moreover the results have been published with peer review back-up in the most prestigious of Science journals.   To date the results off the Roskamp Institute, Johns Hopkins research has been nothing but exemplary.   Comprehensive international patents have also been published telling of the myriad of conditions where the Anatabine/Anatabloc compound is deemed to be effective.

Recent Roskamp and **Johns Hopkins** research funded in part by the <u>Walton Family Foundation</u> confirms that <u>anatabine</u>/(Stars) Anatabloc™:   1. is anti-inflammatory.   2. Lowers <u>C-reactive Protein [CRP]</u> levels in an Alzheimer's model in mice.   3. Inhibits <u>NF-kB</u> activation. NF-kB is the master regulator of inflammatory molecules such as cox-2.   In January <u>Star announced</u> that it had *completed a successful human clinical trial* showing that Anatabloc™ *lowers chronic inflammation* as measured by <u>C-reactive protein [CRP]</u> levels in *human subjects' blood*.

* * * *

So we await the **John's** [sic] **Hopkins** results. Buts [sic] let's first review a centerpiece quote by Dr. Paul Ladenson, Director of the Division of Endocrinology at Johns Hopkins in June 2011 when he stated that, "aside from RCP-006 (anatabine - now Star's Anatabloc™) there is no known compound that stops thyroiditis."

**By my reckoning Johns Hopkins has been specifically investigating anatabine's /now Anatabloc's ™ effects for about 4 years**.   Going back further to 2004 Dr. Ladenson and **Johns Hopkins** conducted studies among a group of flight attendants and found reduction of thyroiditis/Hashimoto's disease related to inhalation of second hand cigarette smoke. Dr. Ladenson has addressed several thyroid disease related conferences referencing **Johns Hopkins** work on the

7

subject, usually in a keynote address at the conference. Just last month (9/21/2012) Dr. Ladenson was awarded the Lewis E. Braverman Award at the 82nd American Thyroid Association's [ATA] Annual Meeting in Québec City, Québec, Canada. In the press release announcing the award it mentioned that, "Currently, Dr. Ladenson is investigating effects of the nutritional supplement *anatabine* on autoimmune Thyroiditis." More below on Dr. Ladenson and the Conference.*

**So Johns Hopkins has been interested in the science for a number of years and has done a lot of work on it to put it mildly....**

(Emphasis added).[2]

21.     And Otis Bradley, of the Research Firm Gilford Securities, reported in an analyst report on August 1, 2012, that:

One example of Star's near-term potential: We believe it possible that a release *of a Johns Hopkins University School of Medicine report* describing positive test results from humans for treatment of thyroid diseases using Star's Anatabine technology could cause sales of Star's Anatabloc anti-inflammatory tablet (now on the market over-the-counter) to skyrocket from virtually nothing today to an annual run-rate over $400 million (with profit of $200 million or $1.00 per share) in 2013. (See "2013 Estimates" page 6.) *Test results from Hopkins* are expected to be released this third (September) quarter. We hope August.

22.     As Gilford Securities disclosed in the report:

In the normal course of business, Gilford Securities seeks to perform investment banking and other services for various companies and to receive compensation in connection with such services. *As such, Gilford Securities intends to seek compensation for investment banking services from the subject company in the next three months.*

The analyst and family members own shares of the subject company.

(Emphasis added).

---

[2] Full text of the article available at <http://seekingalpha.com/instablog/576542-dr-john-faessel/1155291-star-scientific-stsi-the-tipping-point-draws-near>.

## THE TRUTH IS DISCLOSED, DAMAGING INVESTORS

23.     On January 23, 2013, Adam Feuerstein of TheStreet.com released an article demonstrating that Star Scientific had falsely described its relationship with Johns Hopkins.  The article, states in relevant part:

*Star Scientific's Made-Up, Misleading Relationship With Johns Hopkins*

**Adam Feuerstein**

01/23/13 - 08:51 AM EST

GLEN ALLEN, Va. (TheStreet) -- Manti Te'o isn't alone in concocting imaginary relationships.  So, too, is **Star Scientific** (STSI), which has misled investors about the involvement of Johns Hopkins University in the clinical testing of the company's retail nutritional supplement anatabine.

Star Scientific and its Internet stock promoters want investors to believe that Johns Hopkins has been actively involved with, and even supportive of, anatabine's clinical development.  The benefit to Star Scientific is obvious:  Johns Hopkins is well-known and respected, so the school's academic imprimatur lends scientific credibility to anatabine.

Except Johns Hopkins has no official involvement with Star Scientific or anatabine.  That includes Star's subsidiary **Rock Creek Pharmaceuticals**, according to a Johns Hopkins School of Medicine spokesperson.

"The Antabloc Supplementation Autoimmune Prevention [ASAP] clinical study was not conducted at or approved by Johns Hopkins," Johns Hopkins' Stephanie Desmon said via email.

Star reported initial interim results from the ASAP study of anatabine as a potential treatment for thyroid disease on Jan. 7.  The company claims the study succeeded but failed to disclose any real data. Star's press release included a promotional quote about anatabine from Dr. Paul Ladenson, described as a "senior endocrinological consultant" for the study.

Ladenson's real job is director of the Division of Endocrinology and Metabolism at Johns Hopkins School of Medicine.  He's a thyroid disease expert.  Why did Star Scientific omit Ladenson's academic affiliation from its Jan. 7 press release?  Likely because as Desmon made clear, Ladenson's role in Star Scientific's anatabine thyroid disease study had nothing to do with Johns Hopkins.

\* \* \* \*

Star Scientific paid Ladenson for his consulting work, which apparently includes offering this assessment of the anatabine thyroid study:

*Data from this rigorously conducted, placebo-controlled, double blind trial show that anatabine-treated subjects had progressive decreases in circulating thyroglobulin antibody levels, which became significant by the end of the trial. Current treatment for autoimmune thyroiditis is limited to end-stage disease when irreversible gland damage necessitates lifelong thyroid hormone replacement. The prospect of a novel nutritional or pharmaceutical intervention that could preserve thyroid health represents an encouraging advance. Further clinical studies are now warranted.*

Asked to comment on whether Johns Hopkins, as Ladenson's employer, approved his anatabine statement, Desmon responded:

"We do have guidelines about such things and he [Ladenson] is in violation here." Johns Hopkins has started an inquiry into the matter, Desmon added.

Johns Hopkins would not make Ladenson available to comment. Star Scientific did not respond to an email requesting comment.

Dr. Patrizio Caturegli, also a professor at Johns Hopkins Medical School and a paid consultant to Star Scientific, co-authored a paper last year with Ladenson in which mice were treated with anatabine. Star Scientific publicizes the findings of Caturegli's paper without disclosing the company's financial relationship with the authors.

As it stands, there is no science backing Star's claims that anatabine reduces inflammation, relieves pain or treats Alzheimer's, thyroid disease, multiple sclerosis, traumatic brain injury or other auto-immune diseases [These are all medical claims Star makes or insinuates with its constant anatabine promotions.]

Anatabine is not FDA approved for anything, but thanks to lax rules and generous loopholes, Star is able to sell the nutritional supplement over the Internet and at GNC retail outlets. What Star hasn't been able to do is convince people to buy anatabine. Sales are minimal, totaling just $1.7 million in the last reported quarter.

Which is where the Johns Hopkins connection comes into play. Star wants investors and the general public to believe anatabine is a drug capable of curing all sorts of diseases. The marketing message is simple: If Johns Hopkins believes in anatabine, you should too.

Internet stock promoter Dr. John Faessel (he's a dentist) embraces Star's misleading marketing message and runs with it. In two columns posted recently on *Seeking Alpha* – both bullish on Star Scientific – Faessel refers repeatedly to the "successful Rock Creek/Johns Hopkins human trials of anatabine."

Wrong. Johns Hopkins had no involvement in the anatabine trial.

Gilford Securities analyst Otis Bradley also plays along with the deception.  In a recent research note, Bradley writes, "The [anatabine] thyroid research has been done by the John Hopkins University School of Medicine, certainly one of the most preeminent medical institutions in the world, under the lead of Paul Ladenson, chief endocrinologist and one of the preeminent leaders in the world in his profession."

Wrong again.  Star Scientific is solely in charge of the <u>anatabine thyroid study</u>, which recruited patients from nine private U.S. clinics, none with academic credentials.  Ladenson may be an expert on thyroid disease but he's being paid by Star Scientific.

Star Scientific also pays golfer Fred Couples to endorse anatabine.  At this point, there's very little to distinguish Couple's advertising pitch and Ladenson's consulting work.

24.     Following this news, on January 23, 2013, the Company's stock price fell over $0.30 cents per share, or approximately 12%, from its prior closing price of $2.64 per share, on extraordinary volume.  The stock continued to fall in the following week closing at $2.08 on January 30, 2013 a 21% drop from the $2.64 closing price of January 22, 2013.

25.     As Star Scientific would later report on March 18, 2013 in its 10-K for the year ended 2012, it was then served with subpoenas:

*Government Investigation*.   In late January and February of this year, our company, directors and others received subpoenas from the United States Attorney's Office for the Eastern District of Virginia seeking documents.  Our present understanding is that the investigation is principally focused on transactions involving our company's securities including certain private placements and related party transactions since 2006.  We are responding to the subpoenas and intend to cooperate fully with the investigation.  In addition, we engaged outside counsel (the international law firm of Chadbourne & Parke, LLP) to conduct an internal investigation of these matters.

## <u>OTHER FACTS PROBATIVE OF SCIENTER</u>

26.     On January 7, 1994, Defendant Williams consented to entry of judgment in an action brought against him by the SEC.  *SEC v. Williams*, 93-cv-12789-JLT (D. Mass. 1993) (Dkt. # 8) (Tauro, J.).  The SEC alleged that Williams was fraudulently paid by officers of a company to promote its stock while its officers sold their stock.  The SEC obtained a permanent injunction against Williams, together with disgorgement of $294,844.

## LOSS CAUSATION/ECONOMIC LOSS

27.     During the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Star Scientific's stock price and operated as a fraud or deceit on purchasers of STSI stock by misrepresenting the Company's business. Once Defendants' misrepresentations and fraudulent conduct were disclosed to the market, STSI's stock price reacted negatively as the artificial inflation was removed from it.  As a result of their purchases of the Company's stock during the Class Period, Plaintiff and other members of the Class suffered economic loss.

28.     The Defendants' false and misleading statements had the intended effect and caused Star Scientific stock to trade at artificially inflated levels throughout the Class Period.

29.     As investors and the market became aware of STSI's prior misstatements and omissions and that the Company's actual financial condition and business prospects were, in fact, not as represented, Star Scientific's stock price reacted negatively, damaging investors.

## APPLICABILITY OF PRESUMPTON OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

30.     At all relevant times, the market for STSI's common stock was an efficient market for the following reasons, among others:

(a) The Company's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated markets;

(b) During the class period, on average millions of shares of Star Scientific's stock were traded on a weekly basis, demonstrating a very strong presumption of an efficient market;

(c) As a regulated issuer, Star Scientific filed with the SEC periodic reports during the Class Period;

(d) During the Class Period, the Company was eligible and did file short-form registration statements with the SEC;

(e) Star Scientific was followed by at least one analyst employed by a brokerage firm that wrote reports that were distributed to the sales force and certain of its customers during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(f) Numerous NASD member firms were active market-makers in the Company's stock at all times during the Class Period;  and

(g) Unexpected material news about Star Scientific was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

31.    As a result of the foregoing, the market for Star Scientific's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Star Scientific's stock price.   Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Star Scientific's common stock at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased the common stock of Star Scientific during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by Star Scientific or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the misstatements and omissions alleged herein were made with scienter;

(c) whether statements made by Defendants to the investing  public during the Class Period misrepresented and/or omitted material facts about the business, prospects, and operations of Star Scientific; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CLAIM

**Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Against All Defendants**

38.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39.     This First Claim is asserted against Defendants Star Scientific and Williams.

40.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did:  (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Star Scientific common stock at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

41.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Star Scientific as specified herein.

42. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct  as alleged herein in an effort to assure investors of Star Scientific's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

43. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true facts concerning Johns Hopkins' lack of involvement with Anatabloc from the investing public and supporting the artificially inflated price of its common stock.

44. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Star Scientific's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Star Scientific's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's common stock traded, and/or on the

absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired STSI common stock during the Class Period at artificially high prices and were damaged thereby.

45.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth, Plaintiff and other members of the Class would not have purchased or otherwise acquired STSI common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices at which they did.

46.     By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

47.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

48.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation Of Section 20(a) of
### The Exchange Act Against Williams

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     This Second Claim is asserted against Williams.

51.     Williams acted as a controlling person of Star Scientific within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and his participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to the investing public, Williams had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Williams was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

52.     Williams had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

53.     As set forth above, Star Scientific violated Section 10(b) and Rule 10b-5.  By virtue of his position as a controlling person, Williams is liable pursuant to Section 20(a) of the Exchange Act as he culpably participated in the fraud alleged herein.  As a direct and proximate result of Williams' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

54.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 27, 2013

By his attorneys,

 /s/ Thomas G. Shapiro
Thomas G. Shapiro (BBO # 454680)
tshapiro@shulaw.com
Adam M. Stewart (BBO # 661090)
astewart@shulaw.com
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-3939

-and-

Laurence M. Rosen, Esq.
The Rosen Law Firm, P.A.
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (213) 202-3827
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## CERTIFICATION

REDACTED

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. and Shapiro Haber & Urmy, LLP to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Star Scientific, Inc. ("STSI"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the complaint against STSI and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in STSI securities during the class period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 500 | 4/9/2009 | $ 4.65 | | $ |
| 250 | 4/22/2009 | $ 5.21 | | $ |
| 250 | 9/6/2012 | $3.86 | | $ |
| 100 | 2/20/2013 | $ 1.79 | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016

5.     I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _26_ day of _March_, 2013.


Signature: _____
Name:     Charles Barovian
Address:  ███████████████
          ███████████████

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827                    2
OR EMAIL TO INFO@ROSENLEGAL.COM OR SEND BY U.S. MAIL TO:
THE ROSEN LAW FIRM PA
275 MADISON AVENUE, 34th FLOOR
NEW YORK, NY 10016